# UNITED STATES DISTRICT COURT

for the
District of Alaska

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

Information associated with Facebook unique IDs
100008875961936 and 1485557025 that are stored at
premises controlled by Facebook

)
)
)
)
)
)

Case No.  3:16-mj-0351-DMS

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A, incorporated here by reference.

located in the _____ District of _____ALASKA_____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B, incorporated here by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. 2113(a),(d), 18 USC 1951, 18 USC 924(c) | Bank Robbery; Conspiracy to Interfere with Commerce by Robbery; and Interference with Commerce by Robbery; Use of Firearm During and In Relation to Crime of Violence |

The application is based on these facts:
See attached Affidavit in Support of Search Warrant.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

SIGNATURE REDACTED

_____
*Applicant's signature*

Berry Vaughan, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  10/3/16

/S/ DEBORAH M. SMITH
CHIEF U.S. MAGISTRATE JUDGE
SIGNATURE REDACTED

_____
*Judge's signature*

City and state:  Anchorage, AK

Deborah M. Smith, U.S. Magistrate Judge
*Printed name and title*  OCT 0 3 2016

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OFALASKA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF<br><br>Facebook Account with display name Codiene Junkie, unique ID 100008875961936, username tikori.heru, used by Kaleem Tikori Fredericks AND<br>Facebook Account with display name Calel Crofford, unique ID 1485557025, username waevaizwaeva, used by Calel Crofford | Case No. 3:16-mj-00351 DMS |

### AFFIDAVIT IN SUPPORT AN APPLICATION FOR A SEARCH WARRANT

I, **BERRY VAUGHAN**, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with certain Facebook user IDs that are stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscribers or customers associated with the user IDs.

2.      I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI), and have been since January of 2008. Pursuant to my duties as an Agent and as a member of the FBI, I have investigated a number of violations of the United States Code. I also received five months of training at FBI's academy in Quantico Virginia which included training on various investigative techniques.

3.      The facts set forth in this affidavit are based in part on information provided to me by other law enforcement officers, police reports and on my own investigation of this matter. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I

OCT 03 2016

have not included each and every fact known to me concerning this investigation. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.

4.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated."18 U.S.C. § 2711(3)(A)(i).

5.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Section 2113(a), (d) (Armed Bank Robbery), Section 1951(a) (Hobbs Act Robbery and Hobbs Act Conspiracy), and Section 924(c) (Use of Firearm During and In Relation to Crime of Violence) have been committed by Kaleem Fredericks and Calel Crofford. There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## <u>PROBABLE CAUSE</u>

6.     On August 18, 2016, at approximately 10:14 am, the Wells Fargo bank located at 630 East 5th Avenue, Anchorage, Alaska was robbed by two black males. According to the photos obtained by the bank's security system, one bank robber was wearing a red hooded sweater, dark sun glasses, dark pants, and blue and white tennis shoes. He had what appeared to be a sawed off shotgun and blue back pack. The other robber was wearing a gray hooded jacket, dark pants, red and black shoes, and sun glasses. He had what appeared to be a handgun and was carrying a black bag with straps which he placed the money into. A portion of his face was visible in the photos that were released. During the robbery, the male wearing the gray jacket went behind the teller counter where he collected money from all of the tills that he could get into. According to bank employees, he also took some additional money from elsewhere in the bank. $25,956 was stolen from the bank according to the final cash count. The bank robbers pointed their guns at the bank employees and customers.



OCT 3 X 2016

## Photos from August 18, 2016 Robbery of Wells Fargo Bank



Motion Event

Appliance: AU 01018 Fifth Ave
Camera: 4. IP2 Teller 4
Time: 08/18/2016 2:15:06 PM

OCT 3 X 2016
OCT 0 3 2016



Appliance: AU 01018 Fifth Ave
Camera: 15. IP6 Rear Entry/Exit
Time: 08/18/2016 2:14:58 PM

Motion Event

7.    Later in the day, on August 18, 2016, a private citizen (CW1), who is familiar
with Kaleem Fredericks and Calel Crofford, contacted Anchorage Police Department (APD) and
stated that CW1 was sure that the bank robbers were her ex-boyfriend Kaleem Fredericks and his
friend Calel Crofford. The undersigned called and telephonically interviewed CW1 as she is
currently out of the State of Alaska. She stated that she recognized the facial features of Kaleem
Fredericks in the photos released of the bank robbery. CW1 also recognized the clothes that
Kaleem Fredericks was wearing. She stated that the gray hooded jacket that he was wearing
belonged to her and that she had bought him the red and black Air Jordan tennis shoes he was
wearing. She also stated that she recognized the duffel bag he was carrying because that also
belonged to her. She stated that contrary to the APD information released to the public, the
straps of the duffel bag were actually purple, not blue. Other witnesses, including bank
employees and customers, had also reported the straps as purple. CW1 provided the telephone

number (907) 231-4486 as Kaleem Fredericks' telephone number. She stated that she was last in contact with him on August 13th, 2016 on that phone number and that he had threatened her not to come back to her residence. CW1 then blocked telephone calls and texts from that phone number. Additionally, she asked the undersigned if her SUV, a silver Dodge Journey, was at the scene of the bank robbery. At the time of the conversation, no information concerning a vehicle utilized in the bank robbery had been released to the public. CW1 was notified of the robbery through a friend on Facebook who also recognized Fredericks as one the bank robbers. CW1 has a 2014 State of Alaska conviction for MICS6 (open container).

8.     A 2012 Silver Dodge Journey is registered to CW1, Alaska license plate number GNG650.

9.     It was later verified that another witness (CW2) saw the bank robbers getting into what he described as a silver min-van or large SUV. The vehicle appeared suspicious to him because it had tinted windows and was backed into a parking spot and was running. CW2 believed that the driver was black, but could not tell the gender of the driver.

10.     On the morning of the bank robbery, August 18, 2016, at approximately 8:58 a.m., APD reported that two black male adults attempted to break into the Jewelry World kiosk at Dimond Mall. They fled in a Silver Dodge, license plate GNG650.

11.     Video viewed by APD officers showed the persons who attempted to rob the Jewelry World kiosk were wearing clothes that appeared to be some of the same clothes as those worn in the bank robbery. Additionally, the suspects that robbed the kiosk also had the referenced black and purple duffel bag.

12.     On August 11, 2016, at approximately 11:49 p.m., 2 black male adults robbed the Captain Sparrow Liquor Store at 1100 West Benson Blvd., Anchorage, Alaska. During this robbery, the subjects used a shotgun and took the till from the register. Both robbers wore bandanas over their faces. One was dressed in a gray sweater and gray jeans or sweat pants, the other wore a dark blue jacket, a light blue shirt, and black warm up pants with stripes on the side. Crofford was seen in the Captain Sparrow Liquor Store earlier the same day.

13.     Three days prior to the bank robbery, on August 15, 2016, at approximately 11:02 p.m., APD issued a locate for two black adult males involved in the robbery of the Tesoro gas station and convenience store at 545 Muldoon Avenue, Anchorage, Alaska, one of whom was

wearing a gray "hoody" and carrying a sawed off shotgun. The general descriptions were similar to those of the bank robbers.

14.    On August 15, 2016, at approximately 11:34 p.m., APD placed an additional locate for two black males, one of whom was carrying a sawed off shotgun, who robbed the Brown Jug Liquor Store at 119 Klevin Street, Anchorage, Alaska. They were seen leaving in what video showed to be a silver SUV. The men were described as darker skinned black males. According to APD reports, it appeared to be the same subjects wearing different clothes from the first robbery.

15.    On August 14, 2016, at approximately 12:36 a.m., one black male adult robbed the Brown Jug liquor store at 525 West Fireweed Lane, Anchorage, Alaska. A shot gun similar to that seen in the bank robbery was used in the robbery, and a second black male who was initially with the robber waited across the street during the robbery. A silver SUV was seen departing the area after the robbery.

16.    At approximately 11:45 pm on August 18, 2016 the Airport Police at the Ted Stevens International Airport in Anchorage noticed two individuals matching the descriptions of Crofford and Fredericks in the South Terminal of the airport. The police approached the two individuals and requested that they provide identification. After verifying the identities of Crofford and Fredericks, the Airport Police notified the FBI. The FBI and APD responded to the airport.

17.    Fredericks was interviewed by law enforcement and admitted to participating in the August 18, 2016 bank robbery. During the interview, Fredericks also admitted to all of the above robberies except for the robbery of the Brown Jug Liquor Store on August 15, 2016. Fredericks stated that he could not remember the robbery of the Brown Jug Liquor Store on August 15, 2016; however, some of the clothes used in that robbery matched the clothes that Fredericks is wearing on his Facebook page. Fredericks also stated that Crofford, whom he referred to as "Low", was the other individual who participated in the bank robbery and the other robberies.

18.    Fredericks stated that he drove Crofford to the vicinity of the aforementioned bank in CW1's silver Dodge Journey. The two men exited the vehicle and entered the bank. Fredericks stated that he was carrying a "not real" hand gun, which he later called a "BB" gun. Fredericks stated that he did not know if Crofford was carrying a weapon. Fredericks stated that

the gun was initially in the waist band of his pants, but that he may have brandished the weapon before placing it on the teller counter. He then walked behind the teller counter and told the tellers that he didn't want to hurt anyone and that the money belonged to the bank and not them (tellers). He then took money from each of the teller drawers that were unlocked. Fredericks stated that he and Crofford left the bank separately. Fredericks went to CW1's vehicle and drove a short distance away and picked up Crofford.

19.     Fredericks stated that later on the day of the bank robbery Fredericks and Crofford shared a cab to the airport. On the way Fredericks and Crofford split the money from the robbery. Fredericks took what he believed to be about $10,000 and left the rest for Crofford. Fredericks stated that the money from the bank robbery was in his carry-on luggage.

20.     In addition to $10,900 in Fredericks' carry-on luggage, he also had items in both his carry-on luggage and checked luggage to include a Pacsun T-shirt with the tag still attached, a Zumiez T-shirt with the tag still attached, various other clothing articles, a blue OKC baseball cap, a maroon pair of New Balance leather sneakers, six pairs of Nike Air Jordan tennis shoes, and a black and white hooded shirt that appears to be the same as the shirt worn in one of the robberies.

21.     When Crofford was arrested, between his baggage and his person, he had $10,850.35 in U.S. currency, two white and gold iphones, a small amount of suspected marijuana, Black Skull Candy Earphones, personally identifying documentation, six gold chain necklaces including the one he was wearing with the pendant, a Verizon 4G LTE tablet, a small scale, a bible, various clothes including some pants that appeared to be brand new and a hooded sweater, a metal pan, and two pairs of Nike Air Jordan Tennis shoes to include a black and red pair that appears to be the same as the pair worn in some of the robberies. It should be noted that none of the jewelry in Crofford's possession was jewelry from the Jewelry World Kiosk.

22.     Wells Fargo Bank is insured by the Federal Deposit Insurance Corporation, certificate number 16853.

23.     According to employees at Brown Jug Liquor Store, Captain Sparrow Liquor Store, Tesoro, and Jewelry World, all of the businesses are involved in interstate commerce as their distributors and suppliers who supply the goods that are sold at the businesses all ship the goods from other states. The employees stated that the majority of the goods sold at the businesses do not originate in Alaska.

24.     Crofford was also interviewed by law enforcement and denied participating in the bank robbery. After speaking with law enforcement for approximately 1 ½ hours, Crofford invoked his right to an attorney.

25.     On August 18, 2016, after the bank robbery, a consensual search of the hotel room where Crofford and Fredericks had been staying before they left for the airport yielded several receipts and boxes that matched items contained in their luggage. Some of the items included shirts that were purchased with cash at Pacsun and Zumiez, an i-phone and service contract in the name of Calel Crofford, and two shoe boxes for Air Jordan shoes.

26.     On August 18, 2016, a citizen found items that were disposed of in Girdwood, near and in California Creek. These items included a red hooded sweatshirt that appears to be the same as the one worn in the bank robbery; a blue backpack that appears to be the same as the one in the bank robbery; a black ski cap; three BB guns, one of which is similar to the one used in the bank robbery; packaging for one of the BB guns with the security device from the store still attached; $CO_2$ cartridges for the BB guns; five fake rounds for the revolver style BB gun that are the same as the round found in the Dodge Journey; and a blue T-shirt. These items were turned in to the Alaska State Troopers and later transferred to the FBI. Toll records with cell tower and sector information show that the phone belonging to Fredericks with telephone number (907) 231-4486 was in Girdwood, Alaska on August 18, 2016, after the bank robbery.

27.     A search conducted on August 24, 2016 of the same area near California Creek yielded copper colored BBs at the end of the street near California Creek as well as a .410 GA short barreled, short stock shotgun that appears to be the shotgun used in all of the above robberies except for the jewelry kiosk where no weapon was noted. ATF's measurement on the shotgun show the barrel to be 11.875 inches with an overall length of 19.75 inches.

28.     Photos that are publicly accessible on Kaleem Fredericks' and Calel Crofford's respective Facebook pages show them wearing items seized at the time of the bank robbery and some of the items worn during some of the other robberies. These items include a blue jacket with the initials SMF, at least two pairs of Air Jordan tennis shoes, and a gold chain necklace with a medallion. Facebook images with Fredericks and Crofford wearing the same clothes as worn in some of the robberies were reported by APD and later verified by the affiant on the referenced Facebook accounts. All Facebook content discovered to date was publicly accessible by anyone with a Facebook account. The Facebook accounts reflected that Kaleem Fredericks'

Facebook display name is Codiene Junkie and that Calel Crofford's Facebook display name is Calel Crofford.

29.     Flight records reflect that Crofford arrived in Anchorage on August 2, 2016.

30.     With the photographs posted since Crofford arrived in Anchorage, the metadata on the photos is likely to show the places that Crofford and Fredericks were at since Crofford's arrival and may help in identifying co-conspirators as well as establishing their locations near the time of the above robberies.

## BACKGROUND CONCERNING FACEBOOK

31.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

32.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

33.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

34.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings a Facebook user can make information available only to himself or herself, to particular Facebook

OCT 0 3 2016

users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

35. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

36. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

37. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

OCT 0 3 2016

38.    If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

39.    Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

40.    Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

41.    Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

42.    Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

43.    The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

44.    Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

45.    In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

46.    Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends'

Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

47.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

48.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

49.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which

users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

50.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

51.     People that use Facebook usually post many more pictures and messages that are private and not viewable by the public. Further, messages may be posted by people on the friends list or private messaged. In these posts, people that have knowledge of the alleged crimes may help in identifying other crimes or other co-conspirators of the alleged crimes.

52.     A preservation request for Kaleem Fredericks' Facebook account and Calel Crofford's Facebook account was submitted on August 23, 2016 and is good for a period of 90 days. The FBI conducted a public query on Facebook for Codiene Junkie and Calel Crofford which revealed the Facebook usernames tikori.heru and waevaizwaeva, respectively. In response to the preservation request, Facebook indicated that the unique IDs were 100008875961936 and 1485557025, respectively.

### INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

53.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information

(including the content of communications) particularly described in Attachment A. Upon receipt of the information described in Attachment A, government-authorized persons will review that information to locate the items described in Attachment B.

54. This search warrant authorizes the Government to retain after its review all of the items described in Attachment A. This authorization is justified in this case, in part, because:

    a. The investigation is not yet complete and accordingly, it is not possible to predict all possible defendants against whom evidence from the Facebook accounts and associated records might be used. That evidence might be used against persons who have no possessory interest in the accounts' communications and associated records, or against persons yet unknown. Those defendants might be entitled to a copy of communications and associated records in discovery that are not within the scope of Attachment B. Retention of all of the accounts' communications and associated information assures that it will be available to all parties, including those known now and those later identified;

    b. The Government's possession of these materials will not deprive Facebook or the owners of the accounts from possessing the same items;

    c. Should the execution of the warrant uncover data that may later need to be introduced into evidence during a trial or other proceeding, the authenticity and the integrity of the evidence and the government's forensic methodology may be contested issues. Retaining all of the items produced by Facebook can help the Court resolve such claims;

    d. Facebook will likely not close the accounts in response to the search warrant. Accordingly, ongoing access and use of the accounts by the accounts' user(s) or others with access to the accounts may alter or eliminate the items. Thus

OCT **0 3** 2016

retaining the items produced by Facebook assures preservation of these records; and

e. The act of destroying items produced by Facebook could create an opportunity for a defendant to claim that the destroyed items contained evidence favorable to him. Maintaining a copy of the items would permit the Court and government, through an additional warrant if necessary, to investigate such a claim.

55. Based on my training and experience, and the facts as set forth in this affidavit, I believe there is probable cause that on computer systems in the control of Facebook, as set forth in Attachment A, there exists evidence and instrumentalities of violations of Title 18, United States Code, Section 2113(a), (d) (Armed Bank Robbery), Section 1951(a) (Hobbs Act Robbery and Hobbs Act Conspiracy), and Section 924(c) (Use of Firearm During and In Relation to Crime of Violence) as set forth in Attachment B.

56. Based on the foregoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Facebook who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.



OCT 0 3 2016

**FURTHER YOUR AFFIANT SAYETH NAUGHT.**

SIGNATURE REDACTED

BERRY VAUGHAN
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this __3__ day of October, 2016

/S/ DEBORAH M. SMITH
CHIEF U.S. MAGISTRATE JUDGE
SIGNATURE REDACTED

HONORABLE DEBORAH M. SMITH
United States Magistrate Judge

OCT 0 3 2016

## ATTACHMENT A

### Property to Be Disclosed by Facebook and Searched by the Government

This warrant applies to information associated with the Facebook user display name Codiene Junkie, unique ID 100008875961936, username tikori.heru, used by Kaleem Tikori Fredericks and information associated with the Facebook user display name Calel Crofford, unique ID 1485557025, username waevaizwaeva that are stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

For the time period from August 2, 2016 to August 19, 2016, to the extent that the information is within the possession, custody, or control of Facebook, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed above:

(a)  All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)  All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c)  All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them;

(d)  All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

OCT **0 3** 2016

(e)     All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f)     All "check ins" and other location information;

(g)     All IP logs, including all records of the IP addresses that logged into the account;

(h)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(i)     All information about the Facebook pages that the account is or was a "fan" of;

(j)     All past and present lists of friends created by the account;

(k)     All records of Facebook searches performed by the account;

(l)     All information about the user's access and use of Facebook Marketplace;

(m)     The types of service utilized by the user;

(n)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(p)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.



OCT 0 3 2016

**ATTACHMENT B**

**Items to be Seized**

Information described below that constitutes evidence or instrumentalities of violations of ARMED

BANK ROBBERY (18 U.S.C. §§ 2113(a), (d)); BRANDISHING FIREARM DURING CRIME OF

VIOLENCE (18 U.S.C. §§ 924c)(1)(A)(ii), 924(c)(1)(B)(i)); CONSPIRACY TO COMMIT

INTERFERENCE WITH COMMERCE BY ROBBERY (18 U.S.C. § 1951(a)); and INTERFERENCE

WITH COMMERCE BY ROBBERY (18 U.S.C. § 1951(a)) from August 2, 2016 to August 19, 2016,

specifically:

    (a) Communications, photos, messages, posts, and other records related to robbery, firearms, weapons, jewelry, cash;

    (b) Communications, photos, messages, posts, and other records showing Kaleem Fredericks or Calel Crofford wearing clothes, shoes, jewelry, or other items reflected in surveillance video or witness descriptions of robberies;

    (c) Communications, photos, messages, posts, and other records related to the purchase of items using proceeds from a robbery;

    (d) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crimes under investigation and to the Facebook account owners;

    (e) The identity of the person(s) who created or used the user IDs.

    (f) The identity of the person(s) who communicated with the user IDs about matters relating to firearms, weapons, robbery, or items stolen during robbery.

The terms "records," "documents," and "materials" includes evidence in whatever form (e.g., digital/electronic and paper/hard copy format, including but not limited to e-mails, text messages, chat logs, instant messages, and voicemails), such as records, documents, or materials, their drafts, or their modifications that may have been created or stored in, including but not

OCT **0 3** 2016

limited to, any handmade form (such as writing, drawing, sketching, with any implement on any surface directly or indirectly), any mechanical form (such as printing or typing), and any electrical, electronic, or magnetic form (such as computer or digital information on an electronic or magnetic storage device, such as floppy diskettes, computer hard disks, backup tapes, CD-ROMs, CD-Rs, DVDs, optical discs, printer buffers, smart cards, memory calculators, or electronic notebooks, as well as printouts or readouts from any magnetic storage device).



OCT 0 3 2016